**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Alexander KASSER et al., Defendants.**

**Civ. A. No. 74-90.**

United States District Court, D. New Jersey.

March 11, 1975.

William P. Sullivan, and Thomas Loughran, Washington, D. C., for Securities and Exchange Commission.

Rosenman, Colin, Kaye, Petschek, Freund & Emil by Gerald Walpin, Marvin G. Pickholz and Marc Rowin, New York City (New York Bar), for Stephen E. Mochary.

Riker, Danzig, Scherer & Brown by Alvin Weiss, and Dickinson Debevoise, Newark, N. J., for J. M. Brown, Jr., Chester Chastek, River Sawmills Co. and Blue Construction Corp.

Pitney, Hardin & Kipp by Clyde Szuch, Newark, N. J., and Skadden, Arps, Slate, Meagher & Flom by Barry Garfinkel, New York City (New York Bar), for Churchill Forest Industries, (Manitoba) Ltd., Technopulp, Inc., and Churchill Pulp Mill, Ltd.

## OPINION

WHIPPLE, Chief Judge.

The plaintiff Securities and Exchange Commission instituted this action for injunctive and other relief against nine individual and corporate defendants. As set forth in detail infra, the complaint alleges numerous violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), together with Rule 10b–5 thereunder, 17 CFR 240.10b–5. Additionally, there is a cross-claim in the

cause which is not material at this stage of the proceedings.

With the exception of Alexander Kasser, who has yet to be served with process, all of the defendants have moved for dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(1), asserting lack of subject matter jurisdiction. Should this Court deny those motions, defendants Brown, Chastek, River Sawmills Co. and Blue Construction Corporation have filed several alternative motions of which only the following are presently under consideration: (1) that the Manitoba Development Corporation (the allegedly defrauded Canadian entity) be joined as a party, or failing such joinder, that the action be dismissed for failure to join an indispensable party; and (2) that plaintiff's demand for an accounting and restitution by defendant Brown to the Manitoba Development Corporation be stricken. Consideration of the remaining motions has been deferred pending disposition of the applications which are presently before the Court.

## I. THE COMPLAINT

For the purposes of this motion, all well pleaded allegations of the complaint must be accepted as true. Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3rd Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972); Lasher v. Shafer, 460 F.2d 343, 344 (3rd Cir. 1972).

Count I of the complaint indicates that during the mid-1960's the Canadian provincial government of Manitoba sought to interest private enterprise in the creation of a forestry complex at the Pas, Manitoba. An organization called the Manitoba Development Fund (hereinafter M.D.F.), now known as the Manitoba Development Corporation, was created by the government to oversee the development and financing of the project. In 1965 Monoca A.G., a Swiss corporation allegedly owned and controlled by defendant Alexander Kasser, a United States citizen, received an option to develop the complex. Oskar Reiser, a Swiss national, negotiated the option on behalf of Monoca A.G. which, according to the complaint, purported to represent diverse European and American investors in the pulp and paper industry.

In January 1966, negotiations were held in New York, New York between Reiser and Manitoba officials concerning plans for the forestry project. On February 24, 1966 the Province of Manitoba signed an agreement in Canada with defendant Churchill Forest Industries (Manitoba), Ltd. (hereinafter C. F.I.). Under that contract C.F.I. was granted timber concessions in exchange for its commitment to develop, own, and operate the forestry complex. C.F.I. had been incorporated in Canada and was represented to be a subsidiary of Monoca. The defendant Kasser, however, allegedly concealed his complete ownership of both corporations.

The complaint asserts that in furtherance of the scheme defendant Kasser and others fraudulently induced the M. D.F. to enter an investment contract with C.F.I. That contract, entitled a Master Finance Agreement, was negotiated partially in New York but was executed in Canada on November 19, 1966. The agreement provided for the establishment of a forestry complex to be owned and operated by C.F.I. Financing for the project was to emanate principally from the M.D.F., but C.F.I. was required as a condition of the agreement to furnish substantial amounts of its own invested equity capital. The Master Finance Agreement defined said equity capital as money paid in cash for shares of C.F.I. stock, and expressly excluded the use of retained earnings and government grants under the so-called Canadian Area Development Incentive Act (hereinafter A.D.A.).

The very substance of the fraud upon which the complaint is based stems from alleged violations of this provision in the Master Finance Agreement. The defendants, according to the complaint, used elaborate and complex methods of concealing the true nature of the purported equity capital investment in C.F. I.

By way of background, the complaint avers that Kasser's only role in the preliminary negotiations was that of president of the defendant Technopulp Incorporated (hereinafter Technopulp), a New Jersey corporation. When the Master Finance Agreement was signed, the M.D.F. approved a May 1966 engineering and management services contract signed by Kasser for Technopulp and Reiser for C.F.I., which was represented by defendants to be an armslength transaction. Furthermore, the M.D.F. executed an agreement with Monoca A.G. in which Monoca represented that it would invest a minimum of $5,000,000 in C.F.I. stock by March 31, 1971. As in the Master Finance Agreement, the consideration for these shares was not to come from retained earnings of C.F.I. or from A.D.A. grants. Monoca claimed that it had a substantial interest in C.F.I. and that it would fully disclose any change in corporate ownership. Mr. Kasser was represented as having only a minor shareholder interest in Monoca. This so-called "Monoca Agreement", like the other contracts with the M.D.F., was not executed in the United States.

The complaint alleges further that, in employment of the scheme, defendants Kasser and Stephen Mochary, a New Jersey attorney, incorporated the defendant Churchill Pulp Mill, Ltd. (hereinafter Churchill Pulp) in Nevada during June 1969. On June 15, 1969 Technopulp and C.F.I. were consolidated into Churchill Pulp as wholly owned subsidiaries, a structural change which according to the allegations was never disclosed to the M.D.F. Through this device, it is asserted that the defendants were able to "channel" loan disbursements from the M.D.F. and earnings from the project into purported investments in C.F.I. stock.

It appears that Churchill Pulp, through an assignment to it by Kasser of his rights to C.F.I. stock, became responsible for investing the $5,000,000 in equity capital to which Monoca had agreed in the Monoca contract. This as-signment was allegedly confirmed in a letter mailed by Mochary from Montclair, New Jersey to Kasser, whose address is not given. It is alleged that the M.D.F. was never informed of either assignment. As indicated *infra*, Churchill Pulp was eventually to hold the C.F.I. stock through its nominee, the Swiss Bank Corporation.

Paragraph 33 of the complaint contains allegations as to the "mechanics" of funneling M.D.F. money into C.F.I. stock in order to satisfy the requirements of the Master Financing Agreement. The defendants are claimed to have engaged in direct "recycling" of monies advanced as loans by the M.D.F. The scheme allegedly operated in the following manner: After having requisitioned certain monies from the M.D.F. to purportedly pay development costs, C.F.I. would deposit money in the Royal Bank of Canada At Winnipeg, Manitoba in an amount equal to the required percentage of equity investment for the requisition. When the Royal Bank confirmed that it received a deposit designated for stock purchases, the Canadian C.F.I. attorney would certify to the M.D.F. that such funds were received and would issue an appropriate amount of C.F.I. stock in the name of the Swiss Bank Corporation. The M.D.F. would then authorize disbursements of the loan requisition, and C.F.I. would complete the cycle by issuing debentures to the M.D.F. for the loan. While paragraph 33 does not *specifically* allege that the monies deposited in the Royal Bank were part of the same funds disbursed by the M.D.F., there are generalized allegations to that effect contained elsewhere in the complaint. It is thus assumed for the purpose of this motion that the same monies paid to C.F.I. in Canada were henceforth transferred to the Royal Bank as purported equity investments.

Another aspect of the scheme involved the New York office of the Swiss Bank Corporation into which defendants Kasser and Mochary allegedly channeled funds from the middle of June, 1969 un-

til March of 1970. The Swiss Bank was instructed in letters from Mochary to transfer this money by wire from New York to the Royal Bank of Canada in Winnipeg, Manitoba, for the purchase of C.F.I. stock in the Swiss Bank's name. The Swiss Bank held this stock as nominee for Churchill Pulp, whose beneficial ownership was never disclosed to the M.D.F. The complaint asserts that over $3,000,000 in purported stock purchases were routed from Mochary's Montclair, New Jersey office to the New York conduit, and then by wire to the Royal Bank in Winnipeg. Approximately $1,700,000 of this sum was allegedly contributed by Technopulp in the form of dividends to its parent, Churchill Pulp.

The first count of the complaint indicates that a total of more than $38,000,000 was advanced by the M.D.F. to C.F.I. in the form of "loan disbursements and working capital loans". Defendants issued and delivered C.F.I. debentures to the M.D.F. in the total face amount of $40,700,000. In late 1970, C.F.I. defaulted on its interest payments and a receivership action was instituted in January, 1971. The M.D.F. was awarded all of its remaining assets by the Court of Queens Bench in November, 1973.

Count II of the S.E.C.'s complaint alleges similar fraudulent acts on the part of the following defendants: Kasser, Mochary, James M. Brown, Jr., Chester Chastek, River Sawmills Company, a Delaware corporation (hereinafter River) and Blue Construction Corporation, a Delaware corporation (hereinafter Blue). The events contained in this Count occurred from January 1968 until January 16, 1974, the date of the complaint.

The details of the alleged fraud follow a pattern similar to the acts described in the first count. In early 1968, the M.D.F. began to explore the economic feasibility of constructing a large sawmill at the Pas, Manitoba. For various reasons, the M.D.F. insisted on independent ownership of this project. In the summer of 1968, Kasser brought together the M.D.F. and defendant James M. Brown, Jr., who was chairman of a well-established, successful lumber operation called the Pact River Company which owned sawmills in the United States and Canada. Together with Kasser, Brown represented to the M.D.F. that he was willing to invest substantial sums of his own money and to assume the ownership and development of the sawmill.

In January, 1968, according to the complaint, defendants Kasser, Brown and Chester Chastek had met in Montclair, New Jersey to formulate a plan for developing the sawmill. Kasser and Brown agreed that the project would be a joint venture and that Kasser would lend Brown one-half of the front money to promote the operation. Furthermore, River would own the sawmill while Blue would construct a smaller mill for Churchill Pulp and would be the parent corporation for River.

In February, 1968, Kasser sent Brown a check for $25,000 to assist in the formation of Blue and was given the option to convert this loan into half the equity securities of Blue. During the same month, C.F.I. contracted with Blue in Montclair, New Jersey for the construction of a small sawmill at the Pas for the sum of $3,900,000. At a Sicily, Italy meeting in April, 1968, the defendants agreed to apply profits from the small sawmill toward equity in the larger project, with the balance of such equity to be provided through a Swiss bank loan. In late June, River entered into a construction contract with Blue for the large sawmill. The complaint does not specify where this contract was executed.

On September 25, 1968, in Montclair, New Jersey, Kasser, Brown and Chastek caused River to enter into a Master Finance Agreement with the M.D.F. for development of the large sawmill project. As in its agreement with C.F.I., the M.D.F. promised to furnish the major portion of financing in installments which would be matched by proportionate contributions from River's equity.

River also agreed to apply for an A.D.A. grant. Funds from this grant, as well as retained earnings, were expressly proscribed as contributions to River's equity capital. In negotiating with the M.D.F., the defendants represented that River was an affiliate of Brown's Pack River Company. To substantiate that representation, special stationery was allegedly printed in New Jersey for Pack River, denoting the defendant River as an affiliated company.

According to the complaint, the defendants fraudulently requisitioned from the M.D.F. $7,899,356 in four installments during the period from March 11, 1969 until March 26, 1970. Each time a disbursement was sought, the defendants are alleged to have created the false appearance that an additional increment in equity funds had been received by River. For example, the complaint asserts that on or about March 11, 1969, the defendant Chastek telephoned the M.D.F. from Spokane, Washington and falsely represented that River had received the $500,000 in stock purchases necessary under the Master Finance Agreement for requisition of funds. He later confirmed that representation by letter mailed from Spokane to Winnipeg. To substantiate the claim, $500,000 had been deposited in River's account with the Royal Bank Corporation loan and other money from Blue bank accounts in Seattle, Washington. Following the deposit by M.D.F. of $2,000,000 in River's Canadian account, Chastek directed the Royal Bank by telephone to transfer the funds to River's account at the Chemical Bank New York Trust Company in New York City. When the money was received by wire in New York, Alexander Kasser's personal accountant directed that it be transferred from River's account to that of Blue Construction Corporation. Blue thereupon repaid the Swiss Bank loan which originated the transaction.

Similar requisitions were allegedly obtained in August and October, 1969, and in March of 1970. On two occasions, the initial $500,000 placed in River's account was obtained from the account of Blue at the Swiss Bank's New York office. The source of Blue's funds is alleged to have been a previous M.D.F. advance. With respect to the August disbursement, the source of that initial sum was a loan from Technopulp Machinery, Inc., a New Jersey corporation controlled by Alexander Kasser. The complaint alleges that in each transaction, the M.D.F. funds eventually ended up in Blue's New York account.

Pursuant to this scheme, the defendants issued and delivered to the M.D.F. debentures of River with a face amount of approximately $9,600,000. The equity securities allegedly issued by River were valued at approximately $9,600,000.

When the defendants sought another requisition in April, 1970, the M.D.F. refused to release the monies until River had accounted for the loans already received. Although defendants assertedly attempted to create a false appearance of equity investment similar to those described above, the funds were never released. The River operation was shut down in June, 1970. Because River defaulted on its interest payments to the M.D.F. later that year, a receivership action was instituted in the Court of Queen's Bench in January, 1971. M.D.F. was awarded all of River's remaining assets by that court in November, 1973. It is alleged that the simultaneous defaults of River and C.F.I. were in furtherance of the scheme designed by the defendants.

## II.  SUBJECT MATTER JURISDICTION

This Court's determination of the various motions to dismiss is dependent upon the resolution of a singular yet delicate issue: whether Congress, in enacting the securities legislation, intended to confer upon the federal courts jurisdiction to entertain actions involving the particular facts alleged in the Commission's complaint.

The basic thrust of defendants' argument is that the transactions alleged in the complaint were essentially foreign in nature having no significant impact on

either the domestic investing public or the domestic securities markets. Absent the existence of such impact, it is urged that this Court is deprived of subject matter jurisdiction notwithstanding the various allegations of miscellaneous activities occurring within the United States. Conceding that there has been no direct impact,[1] the Commission nevertheless asserts that the federal courts are vested with jurisdiction where a scheme to defraud foreign entities is devised in this country by Americans who utilize the means of interstate commerce to achieve their objectives. For the reasons hereinafter stated, it is concluded that the complaint fails to invoke the subject matter jurisdiction of this Court; therefore, the defendants' motions to dismiss will be granted.

At the heart of the jurisdictional issue is of course the language of the statutes under which this action was instituted. Section 17(a) of the Securities Act of 1933 (hereinafter Securities Act) provides:

> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> > (1) to employ any device, scheme, or artifice to defraud, or
> >
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b) of the Securities Exchange Act of 1934 (hereinafter Exchange Act), also cited in the complaint, contains a similar provision making it unlawful for any person

> by the use of any means or instrumentality of interstate commerce . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.[2]

In support of its position, the Commission emphasizes the words "any person" and "any securities" in those statutes, the reference to "foreign commerce"[3] in the preambles to each, and the definition of interstate commerce in each as including trade, commerce, transportation, or communication "between any foreign country and any State." Securities Act § 2(7); Exchange Act § 3(a)(17). On the surface, the cited language reveals only that, when measured against the facts in this case, Congress did not prescribe an immediate jurisdictional solution to this problem of transnational law. As the Court of Appeals for the Second Circuit observed in the noted case of Leasco Data Processing Equipment Corp.

---

1. During oral argument on the motions, Mr. Sullivan, counsel for the Commission, acknowledged "Again, I will say that as far [as] direct impact on our securities markets are concerned, there is no direct impact."

2. Since the statute is not self-executing, Rule 10b–5 was promulgated by the Commission. Jurisdiction, however, is unaffected by the language of that Rule.

3. For example, the preamble to the Securities Act states that the Act is intended to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof and for other purposes."

v. Maxwell, 468 F.2d 1326, 1334 (2nd Cir. 1972):

> [T]he language of § 10(b) of the Securities Exchange Act is much too inconclusive to lead us to believe that Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security.

At this juncture, it should be noted parenthetically that the vast majority of decisions in which similar jurisdictional issues have arisen, many of which are cited *infra*, involved section 10(b) of the Exchange Act and Rule 10b–5. The jurisdictional principles applicable to those provisions are identical to the principles which relate to section 17(a) of the Securities Act; hence any reference herein to one statute shall be deemed applicable to the other.

As early as 1909, the United States Supreme Court announced a presumption against the extraterritorial application of federal legislation. In American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), the Court found that the Sherman Antitrust Act could not be applied to an action between two American corporations in which the plaintiff did not allege that defendants' activities had a substantial effect within the United States. In United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945), Judge Learned Hand reiterated that

> [w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States.

148 F.2d at 443. See also Blackmer v. United States, 284 U.S. 421, 437, 52 S. Ct. 252, 76 L.Ed. 375 (1937); Restatement (Second) of the Foreign Relations Law of the United States § 38 (1965). In the realm of economic regulation, where Congress is primarily concerned with domestic affairs, the presumption against extraterritorial application is particularly strong. *See* Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S. Ct. 575, 93 L.Ed. 680 (1949). It is now abundantly clear, however, that the presumption may be rebutted so as to permit the assumption of jurisdiction where there are allegations that the extraterritorial conduct produced domestic impact which is violative of federal law. United States v. Aluminum Co. of America, supra; Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911).[4]

The Commission urges this Court to utilize the jurisdictional principle embodied in the Restatement (Second) of Foreign Relations Law of the United States § 17(a)(1965):

> A state has jurisdiction to prescribe a rule of law (a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory . . .[5]

---

4. This is the so-called "objective" territorial principle of jurisdiction found in international law. As commonly construed, the objective principle requires that defendants' conduct was both intended to and did produce effects within the forum state. It is reflected in the Restatement (Second) of Foreign Relations Law at § 18. The various principles have been widely discussed in the context of securities regulation and need not be dealt with here. *See, e. g.* Note, 7 Vand.J. Trans.L. 770 (1974); Note, 8 Tex.Intl.L.J. 430 (1973); Note, 10 Colum.J.Trans.L. 150 (1971); and the multitude of citations therein. Noteworthy is the observation frequently made that the presumption having caused "harsh" results in earlier cases, has

been weakened by subsequent decisions such as *Alcoa*. As the analysis contained *infra* discloses, the Court agrees that jurisdiction has been expanded to include a variety of situations, but the presumption nevertheless survives. *See* Leasco Data Processing Equipment Co. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972); Vanity Fair Mills Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir.) cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

5. This section states the "subjective" territorial principle of jurisdiction. *See, e. g.* Note, 69 Colum.L.Rev. 94 (1969) and citations therein.

The Court agrees that on its face the Restatement approach would appear to permit the exercise of jurisdiction where, as here, conduct has occurred within United States borders. As defendants assert, however, it is essential to distinguish between the permissible limits of jurisdictional power recognized by international law and the extent to which Congress has chosen to implement that power. In short, the question of extraterritorial application in this case is one of municipal, rather than international law. United States v. Aluminum Co. of America, *supra* at 148 F.2d 443. In Leasco Data Processing Equipment Corp. v. Maxwell, *supra,* the Court considered the Restatement in depth and observed:

> Conduct within the territory alone would seem sufficient from the standpoint of jurisdiction to prescribe a rule. It follows that when, as here, there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to have meant to go beyond the limits recognized by foreign relations law. . . .
>
> . . . . . .
>
> Up to this point we have established only that, because of the extensive acts alleged to have been performed in the United States, considerations of foreign relations law do not preclude our reading § 10(b) as applicable here. The question remains whether we should.

468 F.2d at 1334–35.

■ With this background in mind, it is essential to juxtapose the underlying purposes of the securities fraud legislation in order to place the facts of this case in their proper perspective. It is beyond dispute that the principal objective is protection of American purchasers who are exposed to fraudulent offers or sales of securities in interstate commerce.

In Schoenbaum v. Firstbrook, 405 F. 2d 200 (2d Cir. 1968), the Second Circuit considered this objective in terms of its transnational application:

> We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges [6] and to protect the domestic securities market from the effects of improper foreign transactions in American securities.

405 F.2d at 206.

■ The latter part of that statement is reflective of defendants' position in the instant case: Congress did not intend to confer jurisdiction on the federal courts over an essentially foreign transaction in American securities unless that transaction has an impact on domestic investors or securities markets. This Court agrees with that contention.

Curiously, both plaintiff and defendants rely on many of the same authorities to support their respective claims. The Commission asserts that applicable precedent requires only that there be a use of the jurisdictional means in connection with fraudulent conduct, regardless of the non-existence of impact or effects in this country. As defendants suggest, a careful review of comparable decisions in which jurisdiction has been sustained discloses a requisite effect or impact upon American investors or securities markets *in addition to* the use of interstate commerce facilities by the defendants. Hence these cases are clearly distinguishable since there is concededly no impact in the case at bar. *See e. g.,* Securities and Exchange Commission v. United Financial Group, Inc., 474 F.2d 354 (9th Cir. 1973); Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968), rev'd in part on other grounds en banc,

---

**6.** In *Leasco, supra,* the Court reviewed the statute and legislative history and concluded that the protection is not limited to the organized markets. In light of that extensive review, this Court need not reexamine the legislative history.

405 F.2d 215, cert. denied 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

In Leasco Data Processing Corp. v. Maxwell, *supra*, upon which all of the parties heavily rely, the court clarified its view thusly:

[W]e doubt that impact on an American company and its shareholders would suffice to make the statute applicable if the misconduct had occurred solely in England, we think it tips the scales in favor of applicability when substantial misrepresentations were made in the United States.

468 F.2d at 1337. *See also* Travis v. Anthes Imperial Ltd., 473 F.2d 515, 526 n. 21 (8th Cir. 1973), in which Canadian defendants had defrauded American shareholders of a Canadian corporation:

[T]he transaction involved is one which to a significant degree has taken place within the United States, has caused injury to United States investors, and the jurisdiction is grounded upon more than an incidental use of mails or the facilities of interstate commerce.

Cf. Roth v. Fund of Funds, Ltd., 405 F.2d 421 (2d Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969). Although the Commission vigorously urges that it is controlling, Securities and Exchange Commission v. Gulf Intercontinental Finance Corp., 223 F.Supp. 987 (S.D.Fla.1963) is likewise distinguishable. The Court there found that, while no Americans had purchased stock as a result of the allegedly fraudulent offers, American investors had undoubtedly been exposed to the offers on a wide scale. Jurisdiction was thus proper since the Court found that the securities laws clearly apply to the offer of foreign securities within the United States. The complaint in this case is utterly devoid of similar allegations.

■ Defendants have alluded to the following persuasive language in Investment Properties International, Ltd. v. I. O. S., Ltd., CCH Fed.Sec.L.Rep. ¶ 93,011 at 90,727 (S.D.N.Y.1971) aff'd mem, Docket No. 71,572 (2d Cir. 1971):

[A]lthough the behavior of a defendant, including its connection to the United States and to the domestic securities market and exchanges, is relevant in deciding whether an extraterritorial transaction comes within the jurisdiction of the Act, the main consideration appears to be: Does the transaction have some significant impact on the domestic securities market or on domestic investors, and is extraterritorial application therefore necessary to protect securities trading in the United States and/or American investors?

It is of course clear in the case sub judice that there is no showing of domestic impact caused by the allegedly fraudulent conduct of the defendants. On this basis alone, it cannot fairly be said that Congress intended to reach these transactions in the anti-fraud legislation. The Court's inquiry, however, must go one step further in order to determine whether the activities conducted by the American defendants in the United States, though concededly without effect here, were sufficient to give rise to jurisdiction.

In the opinion of this Court, the essentially foreign nature of the transactions here at issue is not materially altered by the various miscellaneous acts allegedly committed locally in furtherance of the scheme. To reiterate, those activities include the following: (1) meetings were held in the United States as part of negotiations; (2) a New York office of the Swiss Bank Corporation was used as a conduit for the transfer of funds, although only a relatively small proportion of those funds was actually so transferred through that bank; (3) one Master Finance Agreement was executed in New York; (4) defendants incorporated most of the corporations in this country and discussed their plans in New Jersey; and, (5) the means of interstate commerce (mails, telephone and telegraph) were employed in furtherance of the scheme. While these domestic activities, in particular the use of American corporations, cannot be ignored, the

Court is nonetheless satisfied that the case before it involves essentially foreign transactions without impact in this country.

A single Canadian entity has invested in debt securities of closely held corporations. The securities were never traded in or even exposed to American markets or investors. Moreover, the securities were given in exchange for funds to be used exclusively in the development of a Canadian forestry complex. The principal issuer of those securities was a Canadian corporation which allegedly transferred the M.D.F. money directly to a Canadian Bank, without the use of American conduits. All but one of the contracts involved were executed outside the country. The existence of American defendants notwithstanding, this Court concludes that it was not the intent of Congress to include essentially foreign transactions such as these within the ambit of the federal anti-fraud legislation. See Investment Properties International, Ltd. v. I. O. S., *supra*; Manus v. Bank of Bermuda, Ltd., CCH Fed. Sec.L.Rep. ¶ 93,299 (S.D.N.Y.1971); Finch v. Marathon Securities Corp., 316 F.Supp. 1345 (S.D.N.Y.1970); Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 F.R.D. 385 (S.D.N.Y. 1969); Kook v. Crang, 182 F.Supp. 388 (S.D.N.Y.1960).

In conclusion, it should be noted that the Court recognizes the seriousness of the allegations against these defendants and the potential ramifications of this decision. Furthermore, it is entirely possible that there exists a legitimate governmental interest in applying the securities legislation to Americans who fraudulently issue securities in essentially foreign transactions. However, the Court remains convinced that this is not the proper forum for adjudication of the controversy. Accordingly, the motions to dismiss will be granted.

### III. REMAINING MOTIONS

In light of the Court's disposition of the jurisdictional motions, it is of course unnecessary to consider any of the remaining motions in the cause.

Defendants shall submit an appropriate order.

No costs.