SECURITIES AND EXCHANGE
COMMISSION, Appellant,

v.

Alexander KASSER et al.

No. 76–1332.

United States Court of Appeals,
Third Circuit.

Argued Nov. 8, 1976.

Decided Jan. 14, 1977.

David Ferber, Sol. to the Com'n, Jacob H. Stillman, Asst. Gen. Counsel, Thomas C. Devlin, Atty., Washington, D. C., for appellant.

Gerald Walpin, Marc Rowin, Rosenman, Colin, Freund, Lewis & Cohen, New York City, and Stephen E. Mochary, Montclair, N. J., for appellee Stephen E. Mochary.

Dickinson R. Debevoise, Alvin Weiss, Riker, Danzig, Scherer & Debevoise, Newark, N. J., for appellees Chester Chastek, James M. Brown, Jr., River Sawmills Co. and Blue Const. Corp.

Barry H. Garfinkel, Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom, New York City, and Clyde A. Szuch, Pitney, Hardin & Kipp, Morristown, N. J., for appellees Churchill Forest Industries (Manitoba) Ltd., Technopulp Inc. and Churchill Pulp Mill Ltd.

Before ADAMS and WEIS, Circuit Judges, and FOGEL, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The central issue in this case is whether the Securities and Exchange Commission (SEC) may invoke the jurisdiction of the federal courts over defendants who have allegedly engaged in fraudulent conduct within the United States, when the sole victim is a foreign corporation and when the purported fraud had little, if any, impact within this country.

### I.

For the purpose of this appeal, the allegations of the amended complaint are deemed to be true and will serve as the factual matrix with which to resolve the jurisdictional issues raised here.[1] Inasmuch as the district court aptly summarized the facts proffered by the pleadings, we need not narrate them at length.[2] Rather, we shall outline only those facts that are necessary for our decision.

Basically, the SEC avers that the defendants engaged in a scheme to defraud and make misrepresentations to the Manitoba Development Fund ("Fund") with respect

---

* Sitting by designation.

1. See Lasher v. Shafer, 460 F.2d 343, 344 (3d Cir. 1972); Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3d Cir.), cert. denied, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

2. The opinion of the district court is reported at 391 F.Supp. 1167 (D.N.J.1975). That opinion was written in connection with the dismissal of the original complaint. The amended complaint, filed by leave of the district court, also was dismissed by an opinion that is unreported. For the text of the unreported opinion, see Appendix at 264–70. The basis for the dismissal of each complaint is exactly the same—to wit, a lack of subject-matter jurisdiction over the securities fraud alleged to have been devised by the defendants.

to the purchase and sale of various securities, including investment contracts, debentures and stock, both preferred and common. The Fund, the sole victim of the fraudulent conduct, is a corporation wholly owned by the Province of Manitoba, Canada. It was formed to interest private enterprise in the creation of a forestry development in that province.

According to the SEC, Kasser and his co-defendants induced the Fund to enter into investment contracts with and acquire debentures of two defendant corporations, Churchill Forest Industries ("CFI") and River Sawmills Company ("River"). These two corporations as well as several others involved in the allegedly fraudulent dealings were largely owned and dominated by Kasser. While CFI was a Canadian corporation with offices in Montclair, New Jersey, River was a Delaware corporation with offices at the same location. And, the Fund entered into the contracts and acquired the debentures based on false representations that Kasser and his associates, or corporations that they controlled, had invested and would invest capital in equity securities of CFI and River over and above the proceeds obtained from debenture sales to the Fund.

Under the investment contracts, the Fund was to make loans to CFI and River in exchange for the debentures. Each loan disbursement would be granted only upon certification that the defendants or their controlled corporations had effected the required equity investments. Both the loans and the equity proceeds were to be spent to establish the forestry development. However, the defendants never made, nor did they intend to make, the equity investments. Instead, they recirculated the proceeds of the loans and debenture transactions in a "ponzi"-like scheme: the defendants made the purported equity investment not with additional capital but with the very money previously made available by the Fund.

The fraud was implemented, in part, by "laundering" the Fund's loan disbursements through various corporations and bank accounts in the United States, Canada, and Switzerland. Over several years, the Fund invested roughly $45,000,000 in debt securities issued by CFI and River, and these payments were made, it is asserted, because of continuous misrepresentations to and concealment of material facts from the Fund. The defendants falsely represented that substantial equity capital had been invested in CFI and River and spent for development of the forestry complex. Moreover, they diverted much of the money invested in CFI and River to their own personal use. As a result, CFI and River have become bankrupt.

Transnational in character, the fraudulent transactions arranged by the defendants spanned at least two continents. But it is clear that a number of acts were committed within the United States. In its opinion, the district court expressly noted that the following conduct had occurred in this country: (1) various negotiations; (2) execution of one of the investment contracts in New York; (3) utilization of the instrumentalities of interstate commerce (*e.g.,* telephones and mails) to further the scheme; (4) incorporation of defendant companies in the United States, or at least the establishment of corporate offices; and (5) use of the New York office of a Swiss bank as a conduit for moneys received from the Fund.[3] Other activities taking place within the United States, according to the complaint but not mentioned by the district court, included (1) maintenance of books and records in this country;[4] (2) drafting of agreements executed elsewhere;[5] and (3) transmittal of proceeds from the transactions to and from the United States.[6] In short, there was significant conduct which

---

**3.** 391 F.Supp. at 1176.

**4.** *See* Amended Complaint at 7, 23–25 (Appendix at 129, 145–48).

**5.** *See, e.g.,* Amended Complaint at 9–15 (Appendix at 131–37).

**6.** *See, e.g.,* Amended Complaint at 19–20 (Appendix at 141–42).

formed part of the defendants' scheme that did occur within this country.

By contrast, it is questionable whether any effect in the United States was wrought by the alleged fraudulent activities of the defendant. The SEC really does not claim that there was any such effect. Apparently, none of the securities was traded on any American exchange, nor did such sales have any measurable impact on domestic markets. In addition, no sale was made to any resident or citizen of this country, the sole victim of the defendants being the Fund, a Canadian corporation.

The SEC brought this action in the New Jersey district court, alleging that the defendants, individual and corporate, violated various antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.[7] It sought injunctions against any further violations as well as ancillary relief. However, the district court dismissed the complaint with prejudice, holding that it lacked subject-matter jurisdiction over the alleged fraud. The SEC then filed the present appeal in this Court.

Since we believe that a district court does have jurisdiction in an SEC suit for injunctive relief under the federal securities laws, given circumstances such as are presented here, we reverse and remand.

## II.

In dismissing the SEC's complaint for injunctive relief, the district court concluded that it lacked subject-matter jurisdiction over the alleged fraudulent activities. That court bottomed dismissal on the ground that the claimed fraud entailed "essentially foreign transactions without impact in this country."[8] The district judge reasoned that conduct without such effect is insufficient for jurisdiction to attach. Even though this premise constituted the essence of its decision to dismiss, the court assumed that conduct without effect in the United States could give rise to jurisdiction. But the trial judge stated that the intranational conduct of the defendants here consisted merely of "miscellaneous acts,"[9] not substantial enough to alter the foreign nature of the transaction. In their briefs and at oral argument, defendants in large part adopted the analysis of the district judge.

Although this case presents a relatively new legal problem, several opinions already have addressed similar matters.[10] They, and their underlying principles, suggest that the position of the district court was too restrictive and that jurisdiction should vest.

Just recently, this Court in *Straub v. Vaisman & Co.*,[11] considered the jurisdictional aspects of transnational securities fraud. There, an American broker-dealer engaged in fraudulent sales of securities to nonresident foreigners. A unanimous panel of this Court found jurisdiction under the 1933 and 1934 Acts. Speaking for the panel, Judge Weis posited that "[c]onduct with-

---

**7.** The SEC contends that the defendants violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b–5, 17 CFR 240.10b–5, the latter having been promulgated by the SEC pursuant to § 10(b) of the 1934 Act.

The SEC brought its action under the jurisdictional provisions of the 1933 and 1934 Acts governing injunctions: § 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b) and § 21 of the Securities Exchange Act, 15 U.S.C. § 78u.

**8.** 391 F.Supp. at 1177.

**9.** *Id.* at 1176.

**10.** *Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976); *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975); *Bersch v. Drexel Firestone, Inc.*,

519 F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Anderson & Co.*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972). *See also Travis v. Anthes Imperial, Ltd.*, 473 F.2d 515 (8th Cir. 1973).

For commentary discussing some of these cases, see, *e.g.*, Note *Extraterritorial Application of § 10(b) of the Securities Exchange Act of 1934—The Implications of Bersch v. Drexel Firestone, Inc., and IIT v. Vencap, Ltd.*, 33 Wash. & Lee L.Rev. 397 (1976); Note, *American Adjudication of Transnational Securities Fraud*, 89 Harv.L.Rev. 553 (1976).

**11.** 540 F.2d 591 (3d Cir. 1976).

in the United States is alone sufficient from a jurisdictional standpoint to apply the federal [securities] statutes . . . ."[12]

It could be argued that *Straub* differs somewhat from the case at hand. The stock in the *Straub* fraud was traded on an American OTC exchange, unlike the securities here which were not so traded. Frequently, trading on an exchange has helped to undergird findings of jurisdiction in other transnational fraud cases.[13] Where a stock exchange is involved, courts have found sufficient impact in the United States to sustain jurisdiction. In addition, there may have been slightly more conduct in the United States in *Straub* than in the present case, for Judge Weis said that the panel was "not here faced with a predominantly foreign transaction."[14] Despite these possible variations, however, *Straub* indicates that jurisdiction does exist in this case. This is so because Judge Weis flatly proclaimed that conduct in this country, standing alone, is enough for jurisdiction to attach under the federal securities laws.[15]

Perhaps the leading opinions which have delved into the problem of jurisdiction in transnational securities fraud cases are *IIT v. Vencap, Ltd.*[16] and *Bersch v. Drexel Firestone, Inc.*[17]—Second Circuit decisions written by Judge Friendly. Of these two cases, *IIT* is more supportive of subject-matter jurisdiction here. In *IIT*, the alleged securities fraud arose out of negotiations outside the United States. These negotiations led to the sale in the Bahamas of preferred stock in Vencap, a Bahamian corporation whose shares were not traded on any American exchange, to IIT, a Luxembourg investment trust. While the Second Circuit intimated that the defendants may well have engaged in sufficient conduct in this country to justify subject-matter jurisdiction under the Securities Acts,[18] the Court nonetheless remanded for additional findings as to the extent and nature of the intranational fraudulent activities. Even so, *IIT* is quite pertinent to the present appeal.

In suggesting that jurisdiction might exist in *IIT*, Judge Friendly made several asseverations which are very damaging to the position of defendants here. He expressly noted that there was "little factual support for the view that [defendants'] activities had a significant *effect* in the United States . . . ."[19] Despite the absence of impact within the United States, Judge Friendly declared that jurisdiction still could exist. In so doing, he essentially rejected the position taken by the defendants in the case before us, i.e., that substantial or even some impact in this country is a prerequisite to jurisdiction over extraterritorial securities transactions.

As critical as may be the rejection of an "effect" requirement is the following declaration in *IIT*:

---

**12.** *Id.* at 595.

In so stating, Judge Weis referred to the Restatement (Second) of Foreign Relations Law of the United States § 17(a) (1965):

A state has jurisdiction to prescribe a rule of law (a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by effects of the conduct outside the territory.

. . .

While § 17 speaks to the permissible limits of an exercise of jurisdiction by this country, the *Straub* panel evidently concluded that Congress sought to employ its power to a considerable extent where securities transactions were concerned.

**13.** *See, e.g., Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir. 1968); *Kook v. Crang,* 182 F.Supp. 388 (S.D.N.Y.1960).

**14.** 540 F.2d at 595.

**15.** It should be noted that the district judge rendered both of his opinions before *Straub,* and so there may be some question whether he would have decided the present case as he did had he had the benefit of the subsequent opinion of this Court.

**16.** 519 F.2d 1001 (1975).

**17.** 519 F.2d 974 (1975).

**18.** The Court stated, for example, that there was "an abundance of American activity. . . . " 519 F.2d at 1018.

**19.** *Id.* at 1016. (Emphasis added)

We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners. * * * it is hard to believe Congress meant to prohibit the SEC from policing [such] activities within this country . . . .[20]

While the defendants in the present appeal contend that such language constitutes dicta, it sets forth a sound proposition, and one which we now adopt.

■ The federal securities laws, in our view, do grant jurisdiction in transnational securities cases where at least some activity designed to further a fraudulent scheme occurs within this country. There is nothing in § 10(b) or its companion anti-fraud provisions to thwart their application to fraudulent transactions when the actual locus of the harm is outside the territorial limits of the United States. Indeed, by their own terms, the anti-fraud laws suggest that such application is proper. The securities acts expressly apply to "foreign commerce," thereby evincing a Congressional intent for a broad jurisdictional scope for the 1933 and 1934 Acts.[21] Moreover, § 10(b) and its related provisions seem to be largely concerned with conduct, having no requirement that accomplishment of the attempted fraud be a precondition to statutory liability.[22]

We are, like the *IIT* court, skeptical that Congress wished to preclude all SEC suits for injunctive relief where the victim of a fraudulent scheme happens to be foreign or where there was insubstantial impact on the United States. Consequently, we decline to immunize, for strictly jurisdictional reasons, defendants who unleash from this country a pervasive scheme to defraud a foreign corporation. This would appear to be especially appropriate where the corporation is owned by a foreign governmental subdivision of a neighboring nation.

The *IIT* court did narrow its decision somewhat by saying: "Our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activities were performed in foreign countries . . ."[23]

In this case the defendants claim that their allegedly fraudulent conduct occurred primarily outside the United States. The district court embraced the defendants' contention in its original opinion, viewing the securities transactions as being "essentially foreign." Thereafter, in dismissing the amended complaint, the trial judge not only reaffirmed his initial position, but also sought to circumvent *IIT,* which had been decided shortly after the filing of the first opinion in this case. While the district court emphasized the above-quoted statement in *IIT,* which somewhat restricted the scope of the decision,[24] we do not believe

---

**20.** *Id.* at 1017.

**21.** We note, for example, the preambles to both Acts indicate that they are to apply to transactions in "interstate and foreign commerce . . . ." 48 Stat. 74 (1933); 48 Stat. 881 (1934). Similarly, the term "interstate commerce" is defined in both enactments as covering any trade, commerce, transportation and communication with "any foreign country." Section 2(7) of the Securities Act of 1933, 15 U.S.C. § 77b(7); § 3(a)(17) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(17). Unfortunately, the legislative history is silent respecting the jurisdictional scope questions at issue here.

**22.** Rule 10b–5, 17 CFR 240.10b–5, for example, prohibits any person participating in securities transactions falling within interstate commerce, from "*employ[ing]* any device, scheme

or artifice to defraud" or "*engag[ing] in any act,* practice or course of business which operates or *would* operate as a fraud. . . ." (emphasis added) Similar language also is present in § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) and in § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b).

Also relevant here is *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), in which the Supreme Court held that the Commission need not prove that any investor has sustained loss as a result of a defendant's fraudulent activities in order to secure injunctive relief.

**23.** 519 F.2d at 1018.

**24.** *See* Opinion of District Court (unreported) at 3–4, Appendix at 267–68.

that *IIT* may be disposed of by mere reference to such language. In our view, the conduct of the defendants here cannot be deemed to be "mere[ly] preparatory" to fraudulent acts committed outside this country, for it was much more substantial than the United States-based activities in *IIT*.[25] It thus would appear that *IIT* supports jurisdiction over this SEC suit, which is primarily for injunctive relief.[26]

*Bersch v. Drexel Firestone, Inc.*[27] is not quite as apposite as *IIT* to the case at bar, even though the *Bersch* court found jurisdiction in part. This is so since some of the *Bersch* victims were resident Americans, and therefore, unlike in *IIT* and our case, there was a definite impact on investors in this country. The Second Circuit did not, however, accord jurisdiction in *Bersch* over the claims of nonresident and foreign plaintiffs. Even so, *Bersch* does contain statements which buttress the result that we reach in this case.

Significantly, the *Bersch* court said that "the antifraud provisions of the federal securities laws . . . do not apply to losses from sales of securities to foreigners . . . unless acts . . . within the United States directly caused such losses."[28] Citing this statement, the defendants here claim that the losses of the Fund were not "directly caused" by acts within the territorial limits of this country. They postulate that conduct in *Bersch* similar to some of the conduct in our case— namely, meetings, drafting of agreements, bank transactions and mailings—was

deemed insufficient to vest jurisdiction over the foreign plaintiffs in that situation.

■ Nevertheless, it appears that there was much more United States-based activity in the present case than in *Bersch*, including, *inter alia*, the execution of a key investment contract in New York as well as the maintenance of records in this country by both American and foreign corporations, records that were crucial to the consummation of the fraud. Not only do we believe that the sum total of the defendants' intranational actions was substantial, but we also question whether it can be convincingly maintained that such acts within the United States did not directly cause any extraterritorial losses. Rather, it is evident that the defendants' conduct occurring within the borders of this nation was essential to the plan to defraud the Fund. As a result, there is little in *Bersch* which stands against jurisdiction in the instant case, even in spite of the fact that the sole victim of the fraud was a Canadian corporation.

In sum, the prior pronouncements of this Court and those of the Second Circuit, a court with especial expertise in matters pertaining to securities,[29] lend great support for a holding of jurisdiction here. *Straub, IIT* and, to a lesser extent, *Bersch* together indicate that such a ruling is the appropriate one. While those cases diverge somewhat from the factual setting present here, the differences do not, in our view, militate against reinstatement of the SEC's complaint seeking injunctive and ancillary relief.

25. The findings of the district court on remand as to the nature and extent of the *IIT* defendants' conduct in this country are set forth at 411 F.Supp. 1094 (S.D.N.Y.1975).

26. In his *IIT* opinion, Judge Friendly makes frequent reference to *Leasco Data Processing Equipment v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972). In *Leasco,* an American corporation alleged that defendants had fraudulently induced it to purchase stock of a British corporation at exorbitant prices. The transaction occurred in England, and the stock was not registered nor traded in the United States. Nevertheless, the Second Circuit found subject-matter jurisdiction because the defendants had engaged in conduct in this country essential to

furtherance of the fraud. It indicated that "significant" intranational conduct would be "sufficient" for subject-matter jurisdiction. *See* 468 F.2d at 1334.

27. 519 F.2d 974 (1975).

28. *Id.* at 993.

29. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 762, 95 S.Ct. 1917, 1938, 44 L.Ed.2d 539 (1975) (Blackmun, J., dissenting). Blackmun referred to the Second Circuit as " 'the Mother Court' in [the securities] area of the law . . . ."

### III.

From a policy perspective, and it should be recognized that this case in a large measure calls for a policy decision,[30] we believe that there are sound rationales for asserting jurisdiction. First, to deny such jurisdiction may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations. By sustaining the decision of the district court as to the lack of jurisdiction, we would, in effect, create a haven for such defrauders and manipulators. We are reluctant to conclude that Congress intended to allow the United States to become a "Barbary Coast," as it were, harboring international securities "pirates."

Also, we are concerned that a holding of no jurisdiction might induce reciprocal responses on the part of other nations. Some countries might decline to act against individuals and corporations seeking to transport securities frauds to the United States. Such parties may well be outside the ambit of the power of our courts. For foreign nations to adopt the position that the defendants are urging this Court to take would enable defrauders beyond the reach of our courts to escape with impunity. By finding jurisdiction here, we may encourage other nations to take appropriate steps against parties who seek to perpetrate frauds in the United States. Accordingly, our inclination towards finding jurisdiction is bolstered by the prospect of reciprocal action against fraudulent schemes aimed at the United States from foreign sources.

As a final policy justification for asserting jurisdiction here, we register the opinion that the antifraud provisions of the 1933 and 1934 Acts were designed to insure high standards of conduct in securities transactions within this country in addition to pro-

tecting domestic markets and investors from the effects of fraud. By reviving the complaint in this case, this Court will enhance the ability of the SEC to police vigorously the conduct of securities dealings within the United States. Such a result would appear to comport with the basic purposes of the federal statutes.

### IV.

It should be noted that reinstatement of the SEC's complaint does not dispose of the question of subject-matter jurisdiction once and for all. Rather, that issue may be raised again should the proofs at trial fail to correspond to or verify the factual allegations submitted by the SEC. If it should be disclosed that the allegedly fraudulent conduct of any of the defendants within this country was nonexistent or was so minimal as to be immaterial, then the district court, or this Court on appeal, may be warranted in dismissing the action for want of jurisdiction.[31] As stated earlier, the decision we reach today rests upon the assumption that the facts tendered by the SEC are true.

The order of dismissal of the district court will be reversed and the matter remanded to that court for further proceedings consistent with this opinion.

---

**30.** *See Straub v. Vaisman & Co.,* 540 F.2d 591, 595 (3d Cir. 1976).

**31.** *See Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1330 (1972).