Charles N. BIRD et al., Plaintiffs-Appellees,

v.

William H. FERRY, Jr., et al., Defendants,

v.

The ROBINSON–HUMPHREY COMPANY, INC., Defendant-Appellant.

No. 73-3107.

United States Court of Appeals, Fifth Circuit.

July 11, 1974.

Rehearing and Rehearing and Rehearing En Banc Denied Oct. 24, 1974.

See also D.C., 51 F.R.D. 310.

Hoke Smith, Prentiss Q. Yancey, Jr., Sam F. Lowe, Jr., Atlanta, Ga., for defendant-appellant.

Sidney L. Nation, Conyers, Ga., for plaintiffs-appellees.

Casper Rich, Decatur, Ga., for other interested parties.

Before COLEMAN, CLARK and GEE, Circuit Judges.

GEE, Circuit Judge:

In 1959 William H. Ferry, a securities salesman, organized the Twenty-Ten Investment Club from citizens of Rockdale County, Georgia, near Atlanta. The club, an unincorporated association, had as a major purpose familiarizing its members with securities transactions, and with the ways of the world of corporate stocks, markets, brokers, etc. As we shall see, there can be no doubt on this record that, in return for their rather modest monthly dues, the members received a great deal of useful information, some of it of a striking nature and delivered in such a manner as to make an indelible impression.

Ferry handled the club's securities account until 1970. During his eleven-year tenure as the club's investment advisor, Ferry worked at various times for three different brokers, always taking the club with him as a customer. Appellant Robinson-Humphrey Company employed him from May or June of 1962 until April 3, 1967. Shortly after transferring the club's account to Robinson-Humphrey, Ferry began to use the club's funds for personal speculation and, by the time he left appellant, had lost nearly all of them.[1] He covered his tracks by furnishing regular statements to the club tracing the vicissitudes of their non-existent stocks. Had he followed the club's instructions, the value of its portfolio at the time he left Robinson-Humphrey would have been a figure over $48,000. Ferry and Robinson-Humphrey were held jointly liable to the club for the above amount, plus interest from the date of loss, on Federal securities' law grounds and in common-law fraud.[2] Robinson-Humphrey appeals, asserting three heads of error, and we affirm.

■ In the first, complaint is made that, since payments from the club's bank account exceeded the contributions of club members by almost $23,000, the club necessarily realized a gain rather than a loss. Appellant has misunderstood the evidence; the "contributions" figures used in appellant's calculation are those of *present* club members only and do not include those of members who have retired, while the "payments" figure includes payments to retiring members. The "gain" thus computed— by subtracting pineapples from pine cones—is without significance.

■■ Appellant also complains that the damages awarded were "theoretical"[3] and should have been computed on a cost or out-of-pocket basis rather than the value basis used. We see nothing inappropriate in the court's use of a measure of damages calculated to restore the club to the position it would have occupied had the defalcations not occurred. Nor, more importantly, are we cited to any Georgia case to the contrary. An additional complaint that the evidence is insufficient to support the damages found is meritless; it may be that the proof falls short of mathematical precision. A host of cases holds it may and still suffice.

■ Appellant's second point asserts that Ferry's conversion of the securities took place prior to his employment by appellant. The argument is founded in the circumstance that they were held in the club's own account with the former employer, but were placed by Ferry in his personal account when he came to work at Robinson-Humphrey. The trial court found otherwise, however, and its finding is amply supported by such evidence as that the club's account was

---

1. Ferry's third employer was also sued by the club, but settled.

2. Robinson-Humphrey's liability was vicarious only.

3. Apparently as based on stocks which were not, because of Ferry's disobedience, actually purchased.

opened by Ferry with appellant in April, while the club's letter to the former employer requesting transfer of the stocks to appellant is dated in June. The court correctly found that Ferry was appellant's employee before the defalcations began, despite Ferry's testimony in one instance to the contrary.

Finally, appellant argues that the finding by the trial court that the club members exercised due diligence for their own protection is clearly erroneous, and that under Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), therefore, the club may not recover. Thinking the finding sufficiently supported by evidence, we disagree. It is true that the club requested Ferry's former employer to deliver the stocks, held in street name, to Ferry, and that the club requested neither a broker's receipt from appellant for them nor confirmations of the authorized trades. Appellant's books of account were never audited or checked by the club. And there was evidence that in 1960 Ferry mishandled nearly $5,000 in funds belonging to one member of the club, who felt Ferry stole his money and may have told other members of his suspicions, though he did not regard Ferry as a crook. On the other hand, Ferry was in, and in the nature of things was known by Robinson-Humphrey to be in, a quasi-fiduciary position: he was the teacher of the club members, who invested with him as much for the experience as for profit. Their degrees of knowledge were, and were acknowledged by all hands to be, unequal. Appellant was a well-known and respected Atlanta house, admittedly supervising such employees as Ferry was with greater stringency today. The club required and received regular reports from Ferry on trades and the portfolio. Many of these appear in the record. Though entirely spurious, they are detailed and convincing. All checks were made payable to Robinson-Humphrey and not to Ferry, and the stamped endorsements are those of

appellant, for deposit only. We cannot say that the trial judge, who heard the witnesses and observed their demeanor, was clearly in error in this finding.

Affirmed.

COLEMAN, Circuit Judge (dissenting).

For the reasons hereinafter appearing, I respectfully dissent.

For lack of due diligence, indeed for the lack of any diligence at all, I would hold that the plaintiffs-appellees are not entitled to mulct the securities dealer in damages under the Securities and Exchange Act when there is no showing that the dealer ever knew that the salesman Ferry had unlawfully converted stock turned over to him personally without a receipt from the broker, nor did the dealer know that Ferry was converting to his own use money turned over to him for the purpose of buying stock, on which the intended purchasers never asked for a receipt or confirmation.

## I

## FACTS

On November 1, 1959, principally motivated by and at the behest of William H. Ferry, Jr., then a securities salesman for J. W. Tindall and Company of Atlanta, the Twenty-Ten Investment Club was formed. It was a private mutual investment partnership. When a new member came in he was required to, and did, sign the partnership agreement. At various times during the life of the Club its membership included a lawyer, a doctor, a bank teller, two real estate brokers, two pharmacists, and the president of a corporation. The basic objectives of the Club were to provide each member with an opportunity to learn about the operations of securities markets, how to buy and sell stocks, how to invest in various securities, and, of course, to make money. The Club had regular, stated monthly meetings, as well as some called meetings. The necessary operating capital was raised by the collection

of monthly dues from the membership. Under the terms of the partnership agreement, a security could be purchased or sold only after a majority of the members had authorized it by a vote appropriately taken. William H. Ferry was a member of the Club and also handled the purchases and sales, reporting on his stewardship at the regular monthly meetings. At the outset, stock purchases were made by check drawn by the Club treasurer. As time passed and as the portfolio grew, this practice was amended by allowing the proceeds of the sales to accumulate in a special cash account maintained by the securities dealer, the treasurer writing checks only when needed to supplement funds on hand in order to complete a purchase.

From 1959 until the Spring of 1962, while William H. Ferry was working for Tindall, all went well. For one thing, the Club treasurer required and diligently kept up with the confirmation slips received of the broker when a sale or a purchase was made, thus eliminating any significant possibility of unilateral fraud on the part of Ferry, had he been disposed to commit such.

In the Spring of 1962, certainly prior to June 14 of that year,[1] Ferry severed his connection with Tindall and went to work as a securities salesman for Robinson-Humphrey, the defendant-appellant, continuing, however, his functions as a member of, advisor to, and salesman to the Twenty-Ten Investment Club.

It was at this point that Ferry began the defalcations involved in this litigation, exposing Robinson-Humphrey to liability for his actions.

J. W. Tindall and Company held the Club's stock in street name. The Club directed that it be transferred to Ferry's new employer. This was done in a most singular fashion. The Club treasurer wrote Tindall:

"Please deliver all stocks held in the account of Twenty-Ten Investors to Mr. William H. Ferry, Jr. for transfer to Robinson-Humphrey Company".

It must be emphasized that the written direction was not that the stock be transferred to Robinson and a receipt obtained, to be filed with the treasurer, but Tindall was told *to deliver the stocks to Ferry*.

Tindall invoiced the stocks to Robinson, but gave both the invoice and the stocks to Ferry. Ferry took the stocks to Robinson, all right, but he there deposited them in his own personal account, not to the Club account as had been the case at Tindall's.

Incredible as it is, no member or officer of the Club ever asked for a confirmation of the transfer or a broker's receipt for the stock. During the eight years that Ferry's fraud continued, as hereinafter described, no member or officer of the Club ever audited, or had audited, or requested a look at the books at Robinson to determine if that Company received the stock or held it in the Club's account.

This occurred despite the fact that during the three year Tindall period the officers-partners of the Club were well familiar with the practice of receiving dealer confirmations for authorized transactions. When a Club officer was replaced he passed these records on to his successor.

With the Club's stock, worth $10,130.75, in his personal account, and with nothing in this record to show that Robinson was ever notified by any officer or Club member that the stock belonged to the Club, Ferry proceeded thereafter to handle the account as if it were really his own. For five years at Robinson, Ferry continued to take directions from the Club and report pretended compliance with those directions as to purchases and sales of stock. Despite his regular reports, generally in writing, he was not making the purchases and sales which the Club had authorized, but was

---

1. On May 8, 1962 (Plaintiffs' Exhibit 3) the Club treasurer wrote a check to Robinson-Humphrey for $329.75 for twenty shares of Alpo Oil stock, indicating beyond question that Ferry had started to work for Robinson-Humphrey at least by that date.

trading on his own, during the course of which he lost the Club's assets *in toto*. Again incredibly, no confirmation of the authorized purchases and sales was ever requested or received by any of the Club officers or members, although the treasurer admitted at the trial that he knew about confirmations and knew what they meant. Indeed, when the treasurer wrote a check to Robinson, intended for the purchase of stock, the checks, in some manner, received a Robinson endorsement but the funds went to Ferry personally. He also lost those funds.

This does not end the matter. In April, 1967, Ferry left Robinson and went with another securities firm. By that time he had lost the Club's assets. He had virtually nothing to transfer to the new employer, but the Club made no attempt to verify the status of its account at that transfer and continued on for two more years before Ferry's dealings were, in a manner not disclosed by the record, at last uncovered.

It is to be noted, however, that from time to time members would retire from the Club and withdraw the assets which the "record" indicated they were entitled to receive. Ferry would make these payments out of any funds available, including his "personal funds", so the Club, its officers, and members proceeded on their way without ever pausing at any time during an eight year period to do so simple a thing as to verify the status of the Club account, relying wholly and solely on Ferry's reports. The only excuse for this course of conduct given at the trial below was that they had confidence in Ferry and relied on the belief that they were doing business with a reputable securities firm.

In its findings of fact, the District Court held as follows:

"That the Investment Club and its members acted as reasonable men under all the circumstances and exercised due diligence".

In light of the undisputed evidence hereinabove recited, I would hold this finding as to diligence to be clearly erroneous. Instead of exercising due diligence, or even minimal diligence, to *know* the status of its accounts, the Club, acting by its officer-partners, if not by its individual members, exercised *no diligence whatever*, not even that of an ordinary individual examining his bank statements at the end of the month. Moreover, I am aware of no logical argument in favor of the proposition that it was *reasonable* for lawyers, doctors, pharmacists, real estate brokers, and corporate presidents to follow over such a long period of time this course of total non-action.

This, of course, is no defense as to Ferry's liability, but we are here concerned with the liability of a securities dealer as a "controlling person", a dealer who has been cast in damages in an amount twice the "out of pocket losses" of the Club.

This does not relieve Robinson of liability under the Georgia law of *respondeat superior*, for Ferry was undisputably an employee of that Company, but it does affect the application of the Securities Exchange statutes to the liability of the defendant-appellant.

## II

### THE APPLICABLE LAW

On the facts recited, plaintiffs filed suit, alleging various violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A., § 78j[2]

2. 15 U.S.C.A., § 78j—Manipulative and Deceptive Devices:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) To effect a short sale, or to use or employ any stop-loss order in connection

with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or

and § 78t,[3] Commission Rule 10(b)–5, 17 C.F.R., § 240.10(b)–5 (1970),[4] and the Georgia common law of fraud and *respondeat superior.*

To recapitulate, plaintiffs claim that due to the lack of adequate supervision, as required by the substantive policy of the Securities Exchange Act of 1934, Ferry was enabled by fraudulent means to convert their property, citing Reynolds and Company, 1960, 39 S.E.C. 902; R. H. Johnson and Company v. Securities & Exchange Commission, 2 Cir., 1952, 198 F.2d 690; Hecht v. Harris, Upham and Company (N.D., Cal.), 1968, 283 F.Supp. 417; and Rule 405 of the New York Stock Exchange.

Robinson argues that due to the plaintiffs failure to act in a reasonable manner and use due diligence in verifying their account, they should be precluded from recovering against it as a "controlling person" who had no other connection with the fraud.

From the plaintiffs' standpoint, the law was perhaps best stated in Reynolds and Company, *supra*:

"We have repeatedly held that brokers and dealers are under a duty to

supervise the actions of employees and that in large organizations it is especially imperative that the system of internal control be adequate and effective and that those in authority exercise the utmost vigilance whenever even a remote indication of irregularity reaches their attention. * * * * a contrary rule would encourage ethical irresponsibility by those who should be primarily responsible

\* \* \* \* \* \*

"Supervisory personnel cannot rely solely upon complaints from customers to bring misconduct of employees to their attention, particularly where customers may be inexperienced and may fail to realize when they have been mistreated

\* \* \* \* \* \*

"Customers dealing with a securities firm expect, and are entitled to receive, proper treatment and to be protected against fraud and other misconduct, and may properly rely on the firm to provide this protection

\* \* \* \* \* \*

"In the light of these considerations we are of the opinion that, where the

---

any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. 15 U.S.C.A., § 78t—Liabilities of Controlling Persons:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

(c) It shall be unlawful for any director or officer of, or any owner of any securities is-

sued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information.

4. 17 C.F.R., § 240.10(b)–5 (1970):

Rule 10(b)5. Employment of Manipulative and Deceptive Devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

failure of a securities firm and its responsible personnel to maintain and diligently enforce a proper system of supervision and internal control results in the perpetration of fraud upon customers or in other misconduct in wilful violation of the Securities Act or the Exchange Act, for purposes of applying the sanctions provided under the securities laws such failure constitutes participation in such misconduct, and wilful violations are committed not only by the person who performed the misconduct but also by those who did not properly perform their duty to prevent it."

Under the law as thus enunciated, the plaintiffs-appellees point out, correctly, that the statute should be liberally construed, that *actual direction* to hold a controlling person liable is not required, and that § 20(a) requires a broker/dealer to take affirmative action and to demonstrate supervision if it is to avoid liability as a controlling person. Admittedly, Robinson did not supervise Ferry between 1963 and 1967, and it did not examine endorsements placed on its checks made payable to the Twenty-Ten Investment Club and endorsed by Ferry as agent of the Club, thereafter deposited in his personal account.

On the other hand, the defendant-appellant relies on the decision of this Court in Clement A. Evans & Company v. McAlpine, 5 Cir., 1970, 434 F.2d 100, cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153. The plaintiff in *Evans* alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A., §§ 78a et seq., 78j, and Commission Rule 10B–5, 17 C.F.R., § 240.10(b)–5 (1970).

Although *Evans* was a suit between brokerage firms, rather than between broker and customer, it involved, as here, the question of who should bear the loss occasioned by dishonesty, in that instance worthless checks in the amount of $308,133.95, drawn by a customer and honored by the plaintiff firm after it had notice of prior worthless checks drawn by the customer. The defendant firm had falsely certified customer ownership of certain stocks, which enabled him "to mirror an image of financial responsibility and solvency while the evidence indicates the contrary was true". In other words, the defendant had violated the Securities Exchange Act and it was alleged that this caused the substantial loss sustained by the plaintiff.

We there held that to recover damages based upon the Securities Exchange Act a plaintiff is obliged to show reasonable diligence and investigation on its own part. On this defense, the verdict was for the defendant and was affirmed on appeal.

The trial judge instructed the jury:

"Now, the defendants also contend that the plaintiff did not exercise reasonable diligence to discover the existence of the alleged fraud. In that connection, I charge you that it is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts calculated to excite inquiry merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.

"If you find from the evidence in this case that the plaintiff had knowledge of facts sufficient to excite its inquiry, and that the peculiar circumstances of this case were sufficient to

impose upon the plaintiff a duty of reasonable diligence, and that the plaintiff failed to exercise this duty, then you should return a verdict for the defendants."

We approved the jury instruction, and declined to "stamp with judicial imprimatur plaintiff's further assertion that reasonable diligence on its part is not a duty imposed by law in a 10(b)–5 civil action for damages".

Further along in the opinion, 434 F.2d at 104, we added:

"Surely plaintiff would not contend that a purchaser or seller could justifiably rely on a fraudulent misrepresentation, no matter how willfully and intentionally made, if that misrepresentation would tax even the most credulous mind."

We then concluded that, "the plaintiff's sophistication, expertise and business acumen in the financial community, his access to information and opportunity to detect the fraud are all relevant considerations in determining the exercise of reasonable diligence (citing cases)".

Upon the application of these standards, note that our present case was not one which involved misrepresentations as to the value, or any aspect of the value, or any other attribute of any stock, bought or sold. The asserted violation of the Securities Exchange Act rested altogether upon an unlawful conversion of plaintiffs' existing stock and the money paid for the purchase of stock which the salesman took for his own. That these plaintiffs had easy and undisputable access to information and a similar opportunity to detect the fraud, had they only asked for it, is not to be doubted. They did not ask for it, although their officers and fellow partners, if not they themselves, knew that they had gone along for five years (as to Robinson) without so much as seeking a confirmation slip or any other ver-

ification that they had an account with the Securities Company or what that account contained. No special business acumen or sophistication or expertise is required to put one on notice that he needs some kind of receipt or confirmation of how one is spending his money or whether he is spending it as directed. In any event, as already indicated, the partner-officers knew, or should have known, from the experience with Tindall, what confirmations were all about.

For the lack of due diligence, *or any diligence whatsoever*, I would hold that the plaintiffs were not entitled to recover against Robinson-Humphrey under the terms of the Securities Exchange Act or the regulations promulgated thereunder.

I do agree that in his dealings with the Twenty-Ten Investment Club, Ferry was an employee of the defendant-appellant and acting within the scope of his authority, although he totally abused that authority. It would necessarily follow that the defendant-appellant was liable in damages under the Georgia common law of fraud and *respondeat superior*. The amount of the liability, however, is different.

### III

### DAMAGES

The District Court held Robinson liable under either or both the Securities Exchange Act and the Georgia common law. While the findings and conclusions of the District Court dated May 31, 1973 [Appendix, 47 et seq.] do not state the basis upon which the Court computed damages, it seems highly probable from a consideration of the record as a whole, and particularly from the contents of the appellees' brief, that the computation may largely have depended upon the Securities Exchange Act.[5]

Even so, appellees [Brief, 25–27] concede that there was a factual basis upon

5. "Instead, the Court chose to fashion what it deemed an appropriate remedy for violation of Rule 10(b) 5", Appellees' Brief, page 29, with further elaboration appearing at pages 30, 31, and 32.

which the Court could have assessed primary liability in the sum of $28,476.32. In this attitude of the case, I would consider it the better part of justice to remand the case to the District Court for an assessment of damages grounded specifically upon the Georgia law of fraud and *respondeat superior*. In performing this function, the District Court could, of course, consider the record as compiled to date and could hear additional argument of counsel if it should desire to do so.

In short, I would affirm as to liability under the Georgia law of *respondeat superior* and remand for a computation of damages accordingly.