Eckart R. STRAUB et al.,
Plaintiffs-Appellees,

v.

VAISMAN AND COMPANY, INC., a
New Jersey Corporation, et al.,
Defendants-Appellants.

Nos. 75–1704, 75–2018.

United States Court of Appeals,
Third Circuit.

Argued March 9, 1976.

Decided June 15, 1976.

Jay D. Fischer, Fischer & Kagan, Clifton, N.J., for defendants-appellants.

Melvin Greenberg, Lowenstein, Sandler, Brochin, Kohl & Fisher, Newark, N.J., for plaintiffs-appellees; Cahill & Kaswell, Washington, D.C., of counsel.

OPINION OF THE COURT

Before VAN DUSEN, KALODNER and WEIS, Circuit Judges.

WEIS, Circuit Judge.

A sale of securities accomplished by the seller's flagrantly fraudulent conduct forms the basis of this suit under the Securities Act of 1933 and the Securities Exchange Act of 1934. We reject a contention that, under the circumstances presented, the purchasers are barred from recovery because they failed to make an independent investigation and, instead, relied upon the integri-

ty of the seller. However, finding no authority to permit the assessment of counsel fees, we reverse that part of the judgment making such an award.

Vaisman and Company (VaisCo) was a registered securities broker-dealer in New Jersey, controlled by the individual defendant William Vaisman, its president and sole stockholder. In 1972, VaisCo hired Charles Erb as an employee and a "consultant" primarily to obtain orders from clients outside the United States. Erb had a number of contacts in Europe, including plaintiff Straub, to whom he had recommended securities purchases since 1970. Straub was a principal and the managing director of Success Portfolio Management Company, a firm in Stuttgart, West Germany, engaged in the management of discretionary securities accounts.

Vaisman and VaisCo allowed Erb to act as their representative and held him out as its director of international operations. On several occasions Straub purchased securities through VaisCo on Erb's advice. Knowing that Straub was interested in new issues, in December, 1972 Erb recommended the purchase of 10,000 shares of Loren Industries. On either December 26 or December 28, 1972, Straub received the following telex in Stuttgart:

> "sold for account 1000 patent centers at 9¼. change loren to mark-1 for new issue situation same will break 1/2/73 will come at dollars 4.00 you have been allotted 5000 for bankhauser ott and 5000 for private bank trust corp will not settle until after first of year per discussion bill vaisman has recommended this issue in preference to the other. vaisman and co"

In reliance on the telex, as well as prior conversations with Vaisman and Erb, Straub authorized the purchase of 10,000 shares of Mark I Offset.[1] On January 3, 1973, VaisCo purchased the stock for plaintiffs at a price of $4 per share. Straub acquired 7,000 shares and the other plaintiffs acquired 3,000 shares. Less than a month later, Mark I Offset filed a Chapter XI bankruptcy proceeding. The plaintiff banks later sold their shares at $.375 per share, but Straub retained his stock.

Plaintiffs filed their complaint in the district court of New Jersey alleging violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Sections 15(c)(1) and 15(c)(2) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78o(c)(1), 78o(c)(2), and S.E.C. Rules 10b–3, 10b–5, 15c1–1, 15c1–2, and 15c1–4, respectively, 17 C.F.R. §§ 240.10b–3, 240.-10b–5, 240.15c1–1, 240.15c1–2, and 240.-15c1–4.

At the conclusion of the trial, the district judge found Vaisman's conduct "shocking to the conscience of this court." Although the evidence demonstrated that the Mark I stock was not a new issue as the telex implied, the court elected to base its decision on failures to disclose, rather than misrepresentation.

Testimony established that VaisCo was a financial consultant to Mark I Offset and had inside information about the imminence of bankruptcy. Moreover, the shares were purchased from Atlas Interfund, a company in which Vaisman not only held a controlling interest but also was an officer and adviser on securities transactions.[2] In addition, VaisCo was a market maker in Mark I Offset, and the current price was less than $4 per share. None of this important information was revealed to Straub before the purchase.

The court held that plaintiffs proved nondisclosure of material facts and awarded the bank plaintiffs $10,875.00 (consideration paid less resale price), and Straub $28,000.00 (conditioned upon return of the stock to defendants). The opinion stated that puni-

---

1. Straub and Success were acting as agents for the plaintiff banks, Bankhauser Ott and Private Bank Trust Corporation.

2. Atlas Interfund held a large block of Mark I Offset on behalf of Vaisman. The district court found that Vaisman, working with Atlas Interfund, planned to sell the Mark I Offset stock to the plaintiffs and use the proceeds to improve VaisCo's capital position.

tive damages were precluded by § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), and denied recovery on that claim. However, because "Vaisman's fraud was willful, wanton and reprehensible," the court allowed counsel fees under the "bad faith" exception to the American rule and fixed the amount at $47,808.42.

## I.

### JURISDICTION

The first inquiry is directed to jurisdiction. Since the plaintiffs are nonresident foreign nationals, the question posed is whether they may invoke the jurisdictional sections of the federal securities laws or are restricted to diversity jurisdiction. The limitation of federal jurisdiction in such circumstances has been discussed in two recent opinions of the Court of Appeals for the Second Circuit: *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389, 44 U.S.L.W. 3344 (1975), and *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975). *See also*, Note, *American Adjudication of Transnational Securities Fraud*, 89 Harv.L.Rev. 553 (1976). The Second Circuit would apply the anti-fraud provisions of federal securities laws to:

1. resident Americans whether or not any acts or culpable omissions of material importance occurred in the United States;

2. Americans resident abroad only for acts or culpable omissions within the United States which significantly contributed to the loss; and

3. foreigners outside the United States only if the proscribed conduct within this country directly caused the loss.

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 993.

■ Unlike the cases in the Second Circuit, we are not here faced with a predomi-

nantly foreign transaction. Because the difficulties inherent in any attenuation of jurisdiction [3] are not seriously implicated in the circumstances of this case, we do not believe it desirable to discuss at length the transnational scope of the federal securities laws. Conduct within the United States is alone sufficient from a jurisdictional standpoint to apply the federal statutes, Restatement (Second) of Foreign Relations Law of the United States § 17 (1965), and the question may simply be whether, on policy grounds, we should apply the securities legislation. *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334–1335 (2d Cir. 1972).

■ Wherever the jurisdictional line is to be drawn, *see IIT v. Vencap, Ltd.*, 519 F.2d at 1018, we entertain no doubt that application of federal law is proper, in this instance, under either the Second Circuit's formulation or that of the ALI Proposed Federal Securities Code § 1604. *Cf. Securities and Exchange Commission v. Kasser*, 391 F.Supp. 1167 (D.N.J.1975). The fraudulent scheme was conceived in the United States by American citizens, involved stock in an American corporation traded on American over-the-counter exchange, and an American securities broker from his office in New Jersey was responsible for the wrongful omissions. Moreover, on policy grounds the interest of the United States in regulating the conduct of its broker-dealers in this country and enhancing world confidence in its securities market is ample justification for applying the securities laws. We conclude that federal jurisdiction was properly invoked.

## II.

### CORPORATE LIABILITY

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[4] prohibits

---

**3.** *See* Note, American Adjudication of Transnational Securities Fraud, *supra*.

**4.** Section 10(b) provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instru-

mentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security

the use of fraudulent schemes or devices in connection with the purchase or sale of securities. To implement the statute, the Commission enacted Rule 10b–5,[5] violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

■ The plaintiff must prove knowledge by the defendant, intent to defraud, failure to disclose or misrepresentation, materiality of the information and, in some instances, reliance by the plaintiff. *Thomas v. Duralite Company, Inc.,* 524 F.2d 577 (3d Cir. 1975); *Rochez Bros., Inc. v. Rhoades I,* 491 F.2d 402 (3d Cir. 1974).

■ The district court found a specific intent to defraud which satisfies the *scienter* requirement discussed in *Ernst & Ernst v. Hochfelder, supra.* The remaining requisites for liability under § 10(b) and Rule 10b–5 are established in the record. VaisCo was held liable both under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), as a "controlling person" and under the common law doctrine of *respondeat superior.*

The company's active participation in the scheme, its receipt of the benefits, and its status as a broker-dealer fully justify imposition of liability. It is clear that VaisCo's role was not merely that of a facade for fraud, but rather one of a culpable confederate. *Cf. Rochez Bros., Inc. v. Rhoades II,* 527 F.2d 880 (3d Cir. 1975); *Thomas v. Duralite Company, Inc.,* 524 F.2d at 586. Although the defendants seek to avoid liability by claiming that Erb was acting on behalf of Straub rather than VaisCo or that Erb was a dual agent, the record justifies the district court's contrary finding.

## III.

## DUE DILIGENCE

Defendants argue that plaintiffs should be barred from recovery because Straub did not exercise due diligence before purchasing the securities. They emphasize that he neither demanded a prospectus nor initiated any investigation into the status of Mark I Offset. They assert that minimal inquiry would have revealed Mark I Offset was not a new issue and brought to light its true market price. Defendants wish to focus solely upon the plaintiffs' conduct and thus escape liability despite the intentional scheme to defraud.

■ The due diligence defense has been asserted in a wide variety of factual settings and its invocation depends upon the circumstances of each case. *See generally, The Due Diligence Requirement for Plaintiffs Under Rule 10b–5,* 1975 Duke L.J. 753 (1975). The applicability of the principle to the case at bar is not patently obvious in light of the origin of the defense and recent developments in 10b–5 litigation.

■ If a plaintiff has actual knowledge of material facts, defendant's failure to disclose the same information will not create a cause of action under 10b–5 since there would be a lack of materiality. Some courts then took the next step and refused to allow recovery where plaintiff had "constructive knowledge" of the withheld information. *See* 2 A. Bromberg, Securities Law: Fraud § 8.4(652); Wheeler *Plaintiff's*

not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

5. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

*Duty of Due Care Under Rule 10b–5: An Implied Defense To An Implied Remedy*, 70 Nw.U.L.Rev. 561 (1976). To overcome this obstacle, the plaintiff was required to show that he exercised appropriate diligence or due care.[6] The courts thus sought to deter investor carelessness in securities transactions[7] and also reduce the number of claims, a trend reflected in other areas as well.

Tightening of eligibility for recovery was a result of the courts' concern with the scope of litigation brought under Rule 10b–5. The judiciary having created a private cause of action soon sensed a need to limit and define it. As one step, the actions of the plaintiff were scrutinized in the context of materiality and reliance.[8] In this court and others, the plaintiffs' conduct was formally isolated as a separate element of the cause of action. *See, e. g., Rochez Bros., Inc. v. Rhoades I, supra.* In those courts where the basis of a 10b–5 recovery began to broaden from intentional to negligent conduct, importation of the tort concept of a plaintiff's contributory negligence was a natural development.

■ However, since *Ernst & Ernst v. Hochfelder, supra*, has limited 10b–5 actions to those in which the defendant has a mental state "embracing intent to deceive, manipulate or defraud," the desirability of a "contributory negligence" defense becomes less compelling. In determining the scope of the due diligence defense, we look to two considerations, common law derivations and deterrence of investor carelessness.

■ Although not determinative, the common law torts of misrepresentation and deceit are relevant in interpreting Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores, supra; Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 169 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The analogy to the common law torts indicates that since intent to defraud is a necessary element of a 10b–5 action, the due care defense should be narrowly circumscribed. Under the common law, once the right to recover for intentional misrepresentation has been established, lack of care on the part of the recipient in accepting the representations as true becomes irrelevant so long as the misrepresentation is not patently false. W. Prosser, Handbook of the Law of Torts § 108 (4th ed. 1971); Restatement of Torts §§ 540, 541 (1938). Moreover, against the background of common law negligence, where the doctrine of comparative negligence is in the ascendency, the policy of denying all recovery to a defrauded plaintiff who was only somewhat careless or understandably trusting may be questioned. However, tort concepts must be balanced against the policies underlying the federal securities laws and the judicially created causes of action, where encouragement of watchfulness in the market place has obvious benefits.[9]

■ In Rule 10b–5 cases, where the defendant acts intentionally, the line should be drawn between the extremes of making the plaintiff's lack of diligence, regardless of degree, a complete bar or at the other limit—completely irrelevant. *Compare Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir. 1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), and *Holdsworth v. Strong* (No. 75–1144, 10th Cir. Feb. 27, 1976), *with Carroll v. First National Bank*, 413 F.2d 353

---

**6.** In *Rochez Bros. v. Rhoades I, supra,* this court discussed the plaintiff's obligation of "due care" when he was an insider but had no access to the pertinent corporate records. A similar situation prevailed in *Thomas v. Duralite Company, supra.*

**7.** Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L.Rev. 584 (1975).

**8.** Other areas in which the courts have sought to limit the class of eligible plaintiffs in Rule 10b–5 actions include limiting the class to actual buyers and sellers, *Blue Chip Stamps v. Manor Drug Stores, supra*, and requiring proof of defendant's intent to defraud. *Ernst & Ernst v. Hochfelder, supra.*

**9.** *See* Wheeler, Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense To An Implied Remedy, *supra.*

(7th Cir. 1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). The latter option fails to encourage investor caution and, under the former view, Rule 10b–5 would provide less assistance to the trusting or gullible than does the common law.

The obligation of due care must be a flexible one, dependent upon the circumstances of each case. We require only that the plaintiff act reasonably. Since the failure to meet that standard is in the nature of an affirmative defense, the burden of proof rests upon the defendant.[10] Such matters as fiduciary relationship, opportunity to detect the fraud, sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information are all worthy of consideration.

The defendant relies principally upon the fact that plaintiff Straub was experienced and well acquainted with the securities industry. But a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce and makes it possible for an almost limitless number of transactions to take place without resort to the courts. *Stier v. Smith*, 473 F.2d 1205 (5th Cir. 1973); *Carroll v. First National Bank, supra; Lehigh Valley Trust Co. v. Central National Bank*, 409 F.2d 989 (5th Cir. 1969).

Knowing that Straub had confidence in Erb, Vaisman abused this trust to promote a transaction which otherwise would have been received with caution. As the district court found, "Vaisman exploited the business relationship of Straub and Erb knowing that Straub was not likely to investigate the merits of Erb's recommendation." Further, Straub did not have access to information about Mark I Offset's plans

to file a Chapter XI proceeding, *see Thomas v. Duralite Co., Inc., supra*, and *Rochez Bros., Inc. v. Rhoades I, supra*. Another significant factor is the timing of the transaction, planned by the defendants to take place during the holiday season which allowed only a very limited opportunity for investigation. The combination of these circumstances places the plaintiffs' conduct within the permissible zone and fully justifies the district court's rejection of the lack of diligence defense.[11] *Bird v. Ferry*, 497 F.2d 112 (5th Cir. 1974).

## IV.

### COUNSEL FEES

While the trial court correctly decided the liability facets of this case, we are compelled to reverse the award of counsel fees. The district judge reasoned that since the plaintiffs had invoked the equity jurisdiction of the court by requesting rescission, there was authority to award counsel fees because of the willful and wanton fraud of the defendants. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), upon which the district court relied, states that:

> "[I]t is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"

And, as we indicated in *Kahan v. Rosenstiel*, 424 F.2d 161, 167 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970):

> "[W]here the behavior of a litigant has reflected a willful and persistent 'defiance of the law,' a court of equity has the power to charge an adverse party with plaintiff's counsel fees as well as court costs."

---

**10.** *See*, Wheeler, Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense To An Implied Remedy, *supra*; Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, *supra*; Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable?, 72 Colum.L.Rev. 562 (1972); *cf.* The Due Dili-

gence Requirements for Plaintiffs Under Rule 10b–5, *supra*.

**11.** Defendants raise several other minor issues which we think were correctly decided by the district court and require no further elaboration here.

After the district court handed down its opinion in this case, the Supreme Court decided *Alyeska Pipe Line Company v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There, the Court expressed its strong support for the "American" rule which prohibits the imposition of attorneys' fees except where authorized by statute or in traditionally recognized exceptions, one being the "bad faith or vexatious conduct" situation.

However, we do not believe that the "bad faith" exception permits the award of attorneys' fees in the circumstances of this case. The private cause of action under § 10(b) and Rule 10b–5 is designed to implement the Congressional intent to regulate securities transactions and must be consistent with the provisions and spirit of the Act. Only in limited circumstances does the statute permit recovery of counsel fees.

Critical to our conclusion in this case is the fact that the bad faith or vexatious conduct of the defendants did not occur during the litigation process but, rather, was inherent in the fraudulent acts which constituted the cause of action itself. As such, the award of counsel fees was punitive in nature. In *Hall v. Cole*, 412 U.S. at 5, 93 S.Ct. at 1946, the Court observed "the underlying rationale of 'fee shifting' [for bad faith or vexatious conduct] is, of course, punitive . . . ." In allowing attorney fees in this case *solely* from the acts which gave rise to the cause of action under § 10(b) and Rule 10b–5, the district court thus awarded both compensatory and exemplary damages.

However, § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), prohibits recovery of any amount in excess of the "actual damages on account of the act complained of. . . ." This bars the recovery of punitive or exemplary damages. *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761 (3d Cir. 1976); *Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974); *Green*

v. *Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

Expressed syllogistically, counsel fee awards based on the "act complained of" are punitive damages for the violation of the statute; such punitive damages are precluded by the Act; ergo, counsel fees in these circumstances are not permitted.

We are not unmindful of the provisions of the Securities Exchange Act which expressly authorize the allowance of counsel fees—*i. e.*, § 9 manipulation of securities prices and § 18 liability for misleading statements.[12] It might be argued, indeed, that the allowance of counsel fees under a § 10(b) proceeding is consistent with the purpose of the Act. However, the unmistakable mandate of *Ernst & Ernst v. Hochfelder, supra*, is that the courts must apply each section of the Securities Exchange Act with precision. The Supreme Court pointed out that in suits under § 10(b) the power to award attorneys' fees is "sharply circumscribed." It is significant that when Congress did authorize counsel fees in other sections of the Act, it did so in conjunction with counterbalancing restrictions, *i. e.*, a requirement of posting of bond for costs and a shortened limitation period. Neither of these restrictive conditions has been incorporated into § 10(b) litigation. *See McClure v. Borne Chemical Co.*, 292 F.2d 824 (3d Cir.) *cert. denied*, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). We believe it would not be in keeping with the statute to read a provision for counsel fees as an item of damages for the violation of any section or subsection unless specifically authorized. *Cf. Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), (fee allowed on common benefit theory); *Young v. Taylor*, 466 F.2d 1329 (10th Cir. 1972), (state law claim permitted counsel fee award).

This is not to say that the "bad faith" exception is totally eliminated from Rule 10b–5 suits. Indeed, in *Ernst & Ernst*

---

**12.** The Securities Act of 1933, as amended in 1934, provides for counsel fees in actions brought under the various provisions of that statute. *See* § 11(e), 15 U.S.C. § 77k(e).

*v. Hochfelder*, 425 U.S. at 210 n. 30, 96 S.Ct. at 1389 n. 30, 44 U.S.L.W. at 4459 n. 30, the Court noted without elaboration that the exception is viable in such cases. But it is necessary to understand the limits of the exception and the reason for its existence. 6 J. Moore, Federal Practice ¶ 54.77[2], at 1709 (2d ed. 1976), states that a federal court may award counsel fees to a successful litigant where "an unfounded action or defense is brought or maintained in bad faith, vexatiously, wantonly, or for oppressive reasons." *See Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Generally, an allowance because of bad faith is based on conduct which occurs during the course of the litigation and may fairly be characterized as redressing the "insult added to injury," *see Adams v. Carlson*, 521 F.2d 168 (7th Cir. 1975); *Townsend v. Edelman*, 518 F.2d 116 (7th Cir. 1975); *Lichtenstein v. Lichtenstein*, 481 F.2d 682 (3d Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974); *Kahan v. Rosenstiel, supra*. In some instances awards have been made for vexatious conduct which occurred before litigation actually commenced, *see Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); [13] *Fairley v. Patterson*, 493 F.2d 598, 606 (5th Cir. 1974); *Sims v. Amos*, 340 F.Supp. 691 (M.D.Ala.), *aff'd summarily*, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). In a few cases the award has been for activity which formed the basis for the suit, *Rolax v. Atlantic Coast Line R. Co.*, 186 F.2d 473 (4th Cir. 1951); *Schlein v. Smith*, 82 U.S. App.D.C. 42, 160 F.2d 22 (1947). In view of the posture of the case *sub judice*, we need not examine this last group of cases. Since we have concluded that the statute precludes an allowance because of bad faith inherent in the cause of action itself, we need concern ourselves here only with conduct which occurred thereafter.

The district court made no reference to any vexatious conduct which occurred during the course of the litigation, and we cannot say that the defense, although unsuccessful, lacked substance. We are not required here to determine if pre-litigation activity falls within the scope of the exception since there are no findings of improper conduct after the fraud took place.[14]

Accordingly, since the bad faith exception was not applicable, the award of counsel fees must be vacated. In all other respects, the judgment will be affirmed.

VAN DUSEN, Circuit Judge (concurring and dissenting in part):

I respectfully dissent only from part IV of the majority opinion, which reverses the award of counsel fees.

In granting the award of counsel fees in this case, the district court made the following statement based on its finding of Vaisman's wilful intent to defraud the plaintiffs:

"In the case *sub judice* the evidence indicates that Vaisman wilfully intended to defraud the plaintiffs. Due to his relationship with Atlas Interfund, Vaisman was in possession of inside information indicating that the future of Mark I Offset was bleak. (Finding of Fact 33). However, this is not merely a case of an insider trading on non-public information. Vaisman exploited the business relationship of Straub and Erb knowing that Straub was not likely to investigate the

---

**13.** The Supreme Court awarded counsel fees to a seaman whose claim for maintenance and cure had been ignored by his employer. Such an allowance would have been permitted by admiralty law but the case has been cited in many nonadmiralty contexts in recent years. For a discussion of that case and others in which prelitigation obduracy was involved, *see Skehan v. Board of Trustees of Bloomsburg State College (II)*, 538 F.2d 53 (3d Cir., 1976).

**14.** Plaintiffs' complaint also alleged violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and §§ 15(c)(1) and 15(c)(2) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78*o*(c)(1) and (2). The district court did not reach these allegations, and we intimate no opinion as to the availability of counsel fees for violations of those sections. We also express no opinion as to the availability of counsel fees to a plaintiff who establishes a pendent state law violation where state law would permit such awards. *See Young v. Taylor, supra*.

merits of Erb's recommendation. Fully aware of this relationship, Vaisman had no doubts that Straub would accept the Erb recommendation, and carried his deception to the point of not even disclosing the condition of Mark I Offset to Erb (Finding of Fact 35). Clearly, Vaisman's fraud was willful, wanton, and reprehensible. Under the circumstances of this case, therefore, I conclude that the defendants should be made to pay plaintiffs' counsel fees. Such an award is in conformity with the equitable nature of these proceedings and the broad, remedial interpretation accorded to federal securities legislation." [1] (Pages 18 & 19 of district court opinion dated 11/15/74, Civil No. 513–73, D.N.J., which is reproduced as item 4 of the appendix.)

In *Hall v. Cole*, 412 U.S. 1, 5 & 15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court of the United States stated:

"Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in 'bad faith, vexatiously, wantonly, or for oppressive reasons.' [page 5, 93 S.Ct. page 1946]

\* \* \* \* \* \*

"It is clear, however, that 'bad faith' may be found, *not only in the actions that led to the lawsuit,* but also in the conduct of the litigation." [page 15, 93 S.Ct. page 1951] (Emphasis added.)

It is clear from the findings of the district court that it found the defendants had proceeded in bad faith "in the actions that led to the lawsuit."

This principle was reaffirmed by the language of the Supreme Court of the United States in *F. D. Rich Co. v. Industrial Lum-*ber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), and more recently in *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

In view of the recognition by the Supreme Court of the United States in its footnote 30 in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210, 96 S.Ct. 1375, 1389 (1976), that the district court has power to award attorney's fees "in the § 10(b) context" where "bad faith" is present, I cannot agree with the majority that the district court does not have discretion to award attorney's fees under the circumstances of this case. See also *Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

In all other respects, I join in the majority opinion.

---

1. The district court opinion also contained this language at page 13:

"More importantly, defendants Vaisman and VaisCo engaged in a course of conduct shocking to the conscience of this court. Vaisman anticipated that Straub would accept the recommendations by Erb and thereby purchase Mark I Offset without inquiry or concern. Taking advantage of the standing business relationship between Straub and Erb, he exploited this to the ultimate benefit of himself and Vais-Co. Vaisman knew the financial condition of Mark I Offset and used this information to rid himself and Atlas Interfund of stock in the failing company."